MARGARET HART EDWARDS, Bar No. 65699
PHILIP ROSS, Bar No. 90042
LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108.2693
Telephone: 415.433.1940

Attorneys for Defendants
PANERA BREAD COMPANY, A DELAWARE
CORPORATION; AND PANERA LLC, A
DELAWARE LIMITED LIABILITY COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATI JOHNS, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PANERA BREAD COMPANY, a Delaware corporation; and PANERA LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 3:08-cv-1071-MEJ<br><br>**DECLARATION OF COURTNEY HIGGINS IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE**<br><br>Time: 10:00 a.m.<br>Date: April 24, 2008<br>Place: Courtroom B, 15th Floor |

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DECL OF COURTNEY HIGGINS IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE
(No. CV 08 1071)

MARGARET HART EDWARDS, Bar No. 65699
LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA  94108.2693
Telephone:    415.433.1940

Attorneys for Defendant
PANERA BREAD COMPANY, A DELAWARE
CORPORATION; AND PANERA LLC, A
DELAWARE LIMITED LIABILITY COMPANY

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATI JOHNS, individually, and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>       v.<br><br>PANERA BREAD COMPANY, a Delaware corporation; and PANERA LLC, a Delaware limited liability company,<br><br>              Defendant. | Case No.  CV 08 1071<br><br>**DECLARATION OF COURTNEY HIGGINS IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE** |

I, Courtney Higgins, having a business address in Richmond Heights, Missouri, do hereby swear, affirm and attest as follows, based upon my personal knowledge of the matters contained herein:

    1.    I am over 18 years of age and competent to testify to the matters stated in this Declaration.  I make this Declaration based upon my personal knowledge through review of Panera Bread records and discussions with other Panera Bread employees.

    2.    I am currently employed by Panera, LLC as a Senior Manager, HR Systems in its corporate headquarters in Richmond Heights, Missouri.  I have been an employee of Panera

since 1998. My direct supervisor is Pam Johnson, Director HR Administration who in turn reports to Rebecca Fine, Senior Vice President, Chief People Officer.

3. Panera Bread Company is a national restaurant chain committed to providing distinctive menu offerings centered on fresh artisan bread.

4. Currently, Panera LLC owns and operates 509 bakery-cafes in 25 states.

5. Panera, LLC is a wholly-owned subsidiary of Panera Bread Company.

6. Panera Bread Company and Panera LLC are both headquartered in Richmond Heights, Missouri, a suburb of St. Louis.

7. Panera Bread Company was originally named Au Bon Pain Company, Inc. In 1993, Au Bon Pain Company, Inc. acquired the St. Louis Bread Company, a chain of restaurants in Missouri. The St. Louis Bread Company restaurants were subsequently re-branded as Panera Bread. In May 1999, all of Au Bon Pain Co., Inc.'s business units were sold, with the exception of Panera Bread, and the company was renamed Panera Bread.

8. There are a number of Panera bakery-cafes owned and operated by franchisees that are not owned or operated by the Company.

9. Of the 509 bakery-cafes directly owned and operated by Panera LLC across the country, only 32 of these bakery-cafes are located in California. 17 are based in Northern California.

10. Only 16 California bakery-cafes were in business prior to January 1, 2007.

11. In total, there are 48 Company-owned bakery-cafes on the West Coast.

12. The Company-owned bakery-cafes are distributed as follows:

| Alabama | 13 | Illinois | 68 | Michigan | 43 | North Carolina | 12 | South Dakota | 1 |
|---|---|---|---|---|---|---|---|---|---|
| California | 32 | Indiana | 30 | Minnesota | 22 | Ohio | 10 | Tennessee | 12 |

| Connecticut | 11 | Iowa | 2 | Missouri | 44 | Oregon | 5 | Texas | 12 |
| Florida | 34 | Kentucky | 12 | Nebraska | 10 | Pennsylvania | 24 | Virginia | 49 |
| Georgia | 10 | Massachusetts | 4 | New York | 30 | South Carolina | 8 | Washington | 11 |

13.     Typically, each Panera Bread bakery-cafe has one General Manager who manages its operations.  There are therefore 509 General Managers working at Company-owned bakery-cafes, distributed across the country in the same fashion as the above list.

14.     Only 32 GM's presently reside in California.  Only 17 reside in Northern California.

15.     The Company did not open its first Company-owned bakery-cafe in California until 2005.  16 of the 32 California bakery-cafes were not opened until 2007.

16.     As a result, there has been limited turnover among the GM's working in the California bakery-cafes.

17.     The total number of current and former GM's located in California is approximately 40 people.

18.     The Company has operated bakery-cafes in Missouri and the nearby states of Illinois, Indiana and Michigan since 1999.

19.     Approximately 150 GM's or former GM's reside in Missouri.

20.     Approximately 500 GM's or former GM's reside in Missouri, Illinois, Indiana or Michigan.

21.     There are approximately 1,400 GM's or former GM's in the United States.

22.     The Company's Operations, Information Technology, Accounting, Purchasing/Supply, Human Resources (including compensation and benefits), Training, and

Security departments are all based in Richmond Heights, Missouri. The individuals in charge of these departments work at the Richmond Heights, Missouri headquarters, and reside nearby in the St. Louis, Missouri area. The policies generated by these departments are largely developed and enforced by personnel located in Richmond Heights, Missouri

23.     Documents (both electronic and hard copy) are, for the most part, stored at the Company's Richmond Heights, Missouri headquarters or in servers located nearby.

24.     It is reasonably foreseeable that many of the Company's employees will be called to testify at trial.

25.     The list of such individuals likely to testify at trial include:[1]

| Name and Location | Title | Subject Matter of Testimony |
|---|---|---|
| Rebecca Fine (Richmond Heights, MO) | Senior Vice President, Chief People Officer | Exempt classification for GM's; policies and procedures regarding overall human resources programs and functions |
| Marianne Grazladei (New York, New York) | Vice President, Operation Tools and Systems | Actual operating systems and procedures of the bakery-cafes |
| Michael Gustafson (Richmond Heights, MO) | Director, Technical Operations | Policies and procedures regarding computer systems, recordkeeping and data storage |
| Stefanie Marie Jerry (Richmond Heights, MO) | Senior Manager, Compensation | Policies and procedures regarding GM compensation |
| Jeffrey Levitt (Richmond Heights, MO) | Senior Manager, Asset Protection | Bakery-cafe security operations and policies and loss prevention |
| William H. Simpson (Dallas, TX) | Senior Vice President, Chief Company & JV Operations | Overall strategic goals of retail operations nationally |
| Patricia Tures (Needham, MA) | Director, Human Resources Services for Operations | Duties and responsibilities of GM's; exempt classification for GM's; GM compensation; policies and procedures regarding overall human resources functions within retail |

[1] Defendants reserve the right to amend this witness list prior to trial.

| | | operations |
|---|---|---|
| Carl Tibbetts (Richmond Heights, MO) | Director, Payroll | Policies, procedures and implementation of GM compensation programs |
| Cathy Watkins (Richmond Heights, MO) | Vice President, Training | GM management training policies, procedures and development; duties and responsibilities of GM's |

Four Vice Presidents of Retail Operations—Irene Cook (Needham, MA), Richard Crannick (Richmond Heights, MO), Mark Davis (Denver, CO) and Christopher Priebe (Detroit, MI), and three Senior Human Resource Managers—Steve Haydu (Sacramento, CA), Marc Fairman (Richmond Heights, MO) and Julie Hollenbeck (Detroit, Michigan) may possess information relevant to this case as well.

26.    Requiring the witnesses listed above to travel from their homes to San Francisco for trial would cause substantial disruption to their personal and professional lives.

27.    The job duties of the witnesses listed above are essential to the Company's day-to-day business operations. The extended and simultaneous absence of these witnesses from their offices to testify for this case would cause material harm to the Company.

28.    As a restaurant chain based on serving fresh, high-quality artisan bread, the Company's bakery-cafes rely upon the prompt delivery of bread dough, produced every morning by one of thirteen regional baking centers. This dough is essential for the Company's operations.

29.    The extended absence of senior management such as Simpson and Fine, at or about to the same time, could negatively impact the efficient production of dough.

30.    It is reasonably foreseeable that the following categories of documents may be relevant to Plaintiff's claims or to the Company's defenses: GM payroll records; GM personnel

files; Human resources policies, analyses and records; GM compensation and benefit plans; Training materials; Point-of-sale records; and Inventory and order management records.

31.      Each of the documents listed in paragraph 31 are located at the Company's Richmond Heights, Missouri headquarters, or stored on servers in the St. Louis, Missouri area.

32.      When printed, these documents may number thousands of pages.

33.      The custodians for these documents work at the Company's headquarters in Richmond Heights, Missouri.

34.      Transporting the documents listed in paragraph 31 from the St. Louis area to San Francisco would impose a substantial burden on the Company.

35.      Testifying about these documents would disrupt the personal and professional lives of the respective custodians of the documents listed in paragraph 31.

36.      Attached hereto as Exhibit A is a true and accurate copy of a document entitled "First Amended and Restated Joint Venture General Manager Compensation Plan," signed by Plaintiff Pati Johns.

37.      Attached hereto as Exhibit B is a true and accurate copy of a document entitled "Employment Agreement JV General Manager," signed by Plaintiff Pati Johns.


I declare under penalty of perjury under the laws of the United States of America that the foregoing declaration is true and correct to the best of my personal knowledge. Executed this 19th day of March, 2008, in Richmond Heights, Missouri.

Courtney Higgins

# EXHIBIT A

**PANERA, LLC**

**FIRST AMENDED AND RESTATED**
**JOINT VENTURE GENERAL MANAGER COMPENSATION PLAN**

THIS FIRST AMENDED AND RESTATED JOINT VENTURE GENERAL MANAGER COMPENSATION PLAN (the "Plan") is entered into as of February 14, 2007, by and between Pati Johns, a resident of the state or commonwealth of California with an address of 2428 Cypress St, Antioch, CA 94509 ("JV GM," "you," or "your") and Panera, LLC, a Delaware limited liability company with a principal place of business at 6710 Clayton Road, Richmond Heights, MO 63117 ("Panera").

A.  WHEREAS, the JV GM and Panera are parties to that certain Joint Venture General Manager Compensation Plan dated as of September 27, 2006 (the "Existing Plan").

B.  WHEREAS, the parties hereto desire to amend the Existing Plan to, among other things, change the timing of the payment of certain amounts due thereunder in order to avoid the application of any excise tax under Section 409A of the Internal Revenue Code of 1986, as amended.

NOW, THEREFORE, in consideration of these premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree that the Existing Plan is amended and restated in its entirety as follows:

1.  **Defined Terms.**    The capitalized terms used in this Plan, and not defined elsewhere in this Plan, have the following meanings:

(a)    "Bakery-Cafe" means bakery-cafe #600929 located at 5897-B Lone Tree Way, 5897-B Lone Tree Way, Antioch, CA 94531, for which you will have managerial responsibility as JV GM.

(b)    "Buyout Date" for the Bakery-Cafe shall be September 15, 2011.

(c)    "Buyout Store Profit" means for the Bakery-Cafe an amount equal to (i) the aggregate JV GM Store Profit for the Bakery-Cafe during the most recently completed Panera financial reporting periods which comprise two (2) fiscal years immediately preceding the Buyout Date, divided by (ii) two (2).

(d)    "JV GM Buyout" means the one-time compensation payment to you by Panera with respect to the Bakery-Cafe payable in accordance with Section 3.

(e)    "JV GM Payout" for a financial reporting period means the positive balance, if any, of the sum of (i) the YTD Share of JV GM Store Profit for the Bakery-Cafe less the Prior Period YTD JV GM Payout, and (ii) any negative Offset Amount.

For example, if the YTD Share of JV GM Store Profit for the Bakery-Cafe is $15,000 and the Prior Period YTD JV GM Payout is $10,000 and the Offset Amount is $0, then the JV GM Payout for that financial reporting period is $5,000.

(f)        "JV GM Store Profit" means, for a given financial reporting period, the sum of (a) store profit with respect to any Bakery-Cafe for that period and (b) the joint venture general manager payout and joint venture general manager buyout accrual expenses for that period, in each case as determined by Panera in its sole discretion in a manner consistent with its then current customary internal accounting practices and/or based upon calculations and assumptions which are also subject to review and revision by Panera in its sole discretion from time to time.

For example, if the Bakery-Cafe in a given financial reporting period has a store profit of $20,000 after all bakery-cafe expenses including joint venture general manager payout and buyout accrual expenses of $2,000 and $1,000, respectively, then the JV GM Store Profit for that period would be $23,000 calculated as the sum of $20,000 and $2,000 and $1,000.

(g)        "JV GM Store Profit Hurdle" for the Bakery-Cafe shall be $153,042.00 annually and shall not be subject to change except by the determination of the Panera JV Board, in the exercise of its sole discretion, or such other governing body as determined by Panera in its sole discretion.

(h)        "Offset Amount" means, with respect to the first fiscal year in which the Plan is effective, $0.00, expressed as a negative number. With respect to each financial reporting period in a subsequent Panera fiscal year, the Offset Amount shall mean an amount, calculated as of the last day of the prior Panera fiscal year, equal to the YTD Share of JV GM Store Profit for the Bakery-Cafe less the Prior Period YTD JV GM Payout, plus the Offset Amount for the prior Panera fiscal year. Therefore, after the first fiscal year, the Offset Amount shall be calculated as of the last day of each Panera fiscal year, and the amount so calculated shall be the Offset Amount for each financial reporting period in the next succeeding Panera fiscal year. The Offset Amount will never be a positive amount greater than zero.

For example, if the YTD Share of JV GM Store Profit for the Bakery-Cafe at the end of fiscal year 2007 is $50,000, the Prior Period YTD JV GM Payout is $60,000, and the Offset Amount for fiscal year 2007 is zero, then the Offset Amount during fiscal year 2008 shall be -$10,000.

Further, for example, if the YTD Share of JV GM Store Profit for the Bakery-Cafe at the end of fiscal year 2007 is $50,000, the Prior Period YTD JV GM Payout is $60,000, and the Offset Amount for fiscal year 2007 is -$10,000, then the Offset Amount during fiscal year 2008 shall be -$20,000.

Further, for example, if the YTD Share of JV GM Store Profit for the Bakery-Cafe at the end of fiscal year 2008 is $50,000, the Prior Period YTD JV GM Payout is $40,000, and the Offset Amount for fiscal year 2008 is -$5,000, then the Offset Amount during fiscal year 2009 shall be zero.

Further, for example, if the YTD Share of JV GM Store Profit for the Bakery-Cafe at the end of fiscal year 2008 is $50,000, the Prior Period YTD JV GM Payout is $40,000, and the Offset Amount for fiscal year 2008 is -$20,000, then the Offset Amount during fiscal year 2009 shall be -$10,000.

(i)        "Prior Period YTD JV GM Payout" for a financial reporting period means the total of all JV GM Payouts made for all previously closed financial reporting periods, not including the current period, during the current fiscal year.

(j)        "YTD JV GM Store Profit" means the sum of the JV GM Store Profit for all financial reporting periods closed to date for the current fiscal year.

(k)        "YTD JV GM Store Profit Hurdle" for the Bakery-Cafe shall be equal to the product of (i) the JV GM Store Profit Hurdle divided by 52, and (ii) the total number of weeks in each financial reporting period which is closed to date for the current fiscal year.

For example, if the JV GM Store Profit Hurdle is $260,000 and five periods of the fiscal year have closed, then the YTD JV GM Store Profit Hurdle shall be $110,000, calculated as follows: the product of (i) $260,000 divided by 52 and (ii) 22.

(l)      "YTD Share of JV GM Store Profit" for the Bakery-Cafe shall mean, if the YTD JV GM Store Profit Hurdle is positive, an amount equal to the sum of (a) the product of (i) the YTD JV GM Store Profit of the Bakery-Cafe up to but not exceeding the YTD JV GM Store Profit Hurdle and (ii) five percent (5%), and (b) the product of (i) the amount by which the YTD JV GM Store Profit of the Bakery-Cafe exceeds the YTD JV GM Store Profit Hurdle and (ii) twenty percent (20%).

For example, if the YTD JV GM Store Profit is $150,000 and the YTD JV GM Store Profit Hurdle is $100,000, then the YTD Share of JV GM Store Profit shall be $15,000 calculated as follows: the sum of (i) the product of (a) $100,000 (or the YTD JV GM Store Profit, $150,000, up to but not exceeding the YTD JV GM Store Profit Hurdle, $100,000) and (b) 5% and (ii) the product of (a) $50,000 (or the YTD JV GM Store Profit, $150,000, in excess of the YTD JV GM Store Profit Hurdle, $100,000) and (b) 20%.

Alternately, for example, if the YTD JV GM Store Profit is $80,000 and the YTD JV GM Store Profit Hurdle is $100,000, then the YTD Share of JV GM Store Profit shall be $4,000 calculated as follows: the sum of (i) the product of (a) $80,000 (or the YTD JV GM Store Profit, $80,000, up to but not exceeding the YTD JV GM Store Profit Hurdle, $100,000) and (b) 5% and (ii) the product of (a) $0 (or the YTD JV GM Store Profit, $80,000, in excess of the YTD JV GM Store Profit Hurdle, $100,000) and (b) 20%.

If the YTD JV GM Store Profit Hurdle is negative (e.g., -$50,000) and the YTD JV GM Store Profit is a negative amount lower (e.g., -$100,000) than the YTD JV GM Store Profit Hurdle, then the YTD Share of JV GM Store Profit for the Bakery-Cafe shall be a negative amount equal to the product of (a) the difference between the YTD JV GM Store Profit and the YTD JV GM Store Profit Hurdle and (b) five percent (5%). For example, if the YTD JV GM Store Profit is -$100,000 for the financial period and the YTD JV GM Store Profit Hurdle is -$50,000, then the YTD Share of JV GM Store Profit is -$2,500 calculated as follows: the product of (a) -$100,000 less -$50,000 and (b) 5%.

If the YTD JV GM Store Profit Hurdle is negative (e.g., -$100,000) and the YTD JV GM Store Profit is either a negative amount (e.g., -$60,000) or a positive amount higher than the YTD JV GM Store Profit Hurdle, then the YTD Share of JV GM Store Profit for the

Bakery-Cafe shall be a positive amount equal to the product of (a) the difference between the YTD JV GM Store Profit and the YTD JV GM Store Profit Hurdle and (b) twenty percent (20%). For example, if the YTD JV GM Store Profit is -$60,000 for the financial period and the YTD JV GM Store Profit Hurdle is -$100,000, then the YTD Share of JV GM Store Profit is $8,000 calculated as follows: the product of (a) -$60,000 less -$100,000 and (b) 20%.

2.    **JV GM Payout.**

(a)    Notwithstanding anything contained herein to the contrary, to be eligible for any JV GM Payout or JV GM Buyout under this Plan, you must have executed and delivered the Panera Employment Agreement, as amended from time to time as the case may be  (the "Employment Agreement") and such other agreements as are reasonably requested by Panera.

(b)    So long as you are an employee of Panera as of the date on which payment of the JV GM Payout is made and are performing the duties of the position currently entitled JV GM for the Bakery-Cafe as of this date, Panera will make the JV GM Payout, if any, for a financial reporting period on or before the third fourteen day payroll after the period to which the payment relates.

(c)    You will not be required to repay any Offset Amount to Panera, but the then current Offset Amount will be offset in the calculation of future JV GM Payouts, as contemplated in Section 1(e).

3.    **JV GM Buyout.**

(a)    Panera shall, if it is required to do so pursuant to this Section 3, make a one-time JV GM Buyout for the Bakery-Cafe on the terms and conditions set forth herein and upon execution and delivery of such agreements as are reasonably requested by Panera.  In order to receive the JV GM Buyout payment for the Bakery-Cafe, you must, as of the date on which the payment is made in accordance with this Section 3, (i) be an employee of Panera as of the date on which payment of the JV GM Buyout is made, (ii) be performing the duties of the position currently entitled JV GM as of this date, and (iii) not be in breach of any provision of your Employment Agreement or any other obligation owed to Panera or its affiliates.

(b)    With respect to the Bakery-Cafe, Panera shall pay you an amount, if any, determined in accordance with the following:

a.    If the JV GM Store Profit Hurdle and the Buyout Store Profit are positive numbers, the amount equal to (i) the sum of (A) the product of (1) the Buyout Store Profit up to but not exceeding the JV GM Store Profit Hurdle and (2) five percent (5%) and (B) the product of (1) the amount by which the Buyout Store Profit exceeds the JV GM Store Profit Hurdle and (2) twenty percent (20%), (ii) divided by two (2), and (iii) multiplied by 5.5.

b.  If the JV GM Store Profit Hurdle is a negative number (e.g., -$20,000) and the Buyout Store Profit is a less negative number (e.g., -$10,000) or a positive number, the amount equal to (i) the product of (A) the difference between the Buyout Store Profit and the JV GM Store Profit Hurdle and (B) twenty percent (20%), (ii) divided by two (2), and (iii) multiplied by 5.5.

c.  If the JV GM Store Profit Hurdle is a positive number and the Buyout Store Profit is a negative number, the amount shall be zero.

d.  If the JV GM Store Profit Hurdle is a negative number (e.g., -$20,000) and the Buyout Store Profit is a greater negative number (e.g., -$40,000), the amount shall be zero.

(c)  Panera shall make any JV GM Buyout payment that is due and payable with respect to the Bakery-Cafe no later than the fifth fourteen day payroll after the fiscal period during which the Buyout Date occurs.  Notwithstanding the preceding sentence, in no event will payment occur after March 15th of the calendar year following the calendar year in which the Buyout Date occurs.

(d)  After the JV GM Buyout payment has been completed or it is determined that no JV GM Buyout payment is payable with respect to the Bakery-Cafe, Panera may, at its sole discretion, (i) terminate this Plan, (ii) continue to make the JV GM Payouts under Section 2 (in which case Panera may determine in its sole discretion whether to designate a new JV GM Store Profit Hurdle) or (iii) continue to make the JV GM Payouts under Section 2 (in which case Panera may determine in its discretion whether to designate a new JV GM Store Profit Hurdle) and designate a new Buyout Date for purposes of a JV GM Buyout under Section 3.  If Panera determines in its discretion to continue to make the JV GM Payouts, the JV GM agrees to continue to manage the Bakery-Cafe in exchange for the right to receive a JV GM Payout as calculated in this Plan. Should Panera fail to designate its intentions with respect to the continued operation of the Bakery-Cafe under subparts (i), (ii) or (iii) above, and you are continuing to manage the Bakery-Cafe, Panera's election shall be deemed to be made under subpart (iii) at the current JV GM Store Profit Hurdle until further notice thereof is given by Panera.

4.  **Continued Employment**.    Nothing in this Plan shall be construed to give you any right or assurance of continued employment by Panera; your employment relationship with Panera is terminable at will, with or without notice, with or without reason, by either Panera or you.

5.  **Miscellaneous**.

(a)  This Plan and any dispute arising hereunder shall be governed by the laws of the State of Missouri, without giving effect to its conflict of law provisions, and the courts located in such state shall have exclusive jurisdiction over such matters. You agree and consent to waive trial by jury in any action or proceeding between the parties.

(b)  All payments under this Plan are subject to withholding of all applicable federal, state and local taxes.

(c)    The captions and headings throughout this Plan are for convenience and reference only, and they shall in no way be held or deemed to define, modify or add to the meaning, scope or intent of any provision of this Plan.

(d)    This Plan is the final, complete and exclusive agreement between you and Panera with respect to any bonus, incentive plan or other compensation, except as specifically set forth in your Employment Agreement with Panera, and supersedes and merges all prior discussions and other agreements between us including, without limitation, the Existing Plan.  No modification or waiver shall be valid unless in a writing signed by the party against whom the same is sought to be enforced.

(e)    This Plan may be executed simultaneously in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original but all of which counterparts shall together constitute but one agreement.

[signature page follows]

IN WITNESS WHEREOF, the parties have executed this First Amended and Restated Joint Venture General Manager Compensation Plan as of the date first written above.

**Panera, LLC**

By: _____

Name: John Maguire

Title:    Executive Vice President

**JV GM**

Name:  Pati Johns

# EXHIBIT B

## EMPLOYMENT AGREEMENT

## JV GENERAL MANAGER

THIS EMPLOYMENT AGREEMENT (the "Agreement"), is made and entered as of September 27, 2006 by and between Pati Johns, whose address is 2428 Cypress St, Antioch, CA 94509 ("JV General Manager" or "Employee"), and PANERA, LLC, a Delaware limited liability company, having its principal office at 6710 Clayton Road, Richmond Heights, Missouri 63117 ("Panera"), with reference to the following facts:

A.      Panera is engaged in the business of, among other things, developing, owning and operating bakery-cafes utilizing an operating system, trademarks and other intellectual property owned by it or its affiliates.

B.      Panera desires to employ Employee as its JV General Manager of the Bakery-Cafe (as defined in the Compensation Plan) to be designated by Panera, and Employee desires to serve as the JV General Manager for such Bakery-Cafe, upon the terms and conditions stated herein.

NOW, THEREFORE, in consideration of the foregoing recitals, and of the promises, covenants, terms and conditions contained herein, the parties hereto agree as follows:

1.      **Prior Agreements are Terminated.**   This Agreement constitutes the entire agreement between the parties hereto concerning the subject matter hereof, and supersedes all and results in the termination of all prior offer letters, memoranda, correspondence, conversations, and agreements relating to the employment of Employee by Panera, except as otherwise specifically set forth in the Panera Joint Venture General Manager Compensation Plan (the "Compensation Plan") executed by the parties are as specified in Section 8 hereof.

2.      **Definitions**.  All capitalized terms used in this Agreement and not defined herein shall have the meanings set forth in the Compensation Plan executed by the parties.

3.      **Employment and Term.**  Subject to earlier termination as provided in Section 7, Panera hereby employs Employee, and Employee hereby accepts employment with Panera, as JV General Manager of the Bakery-Cafe identified in the Compensation Plan.  The term of such employment is referred to herein as the "Term of Employment".

Concurrently with the execution of this Agreement, Panera and Employee shall execute the Compensation Plan.  The employment of Employee shall be on an "at-will" basis, meaning that either Employee or Panera may terminate this Agreement at any time, with or without cause, for any reason whatsoever or for no reason.   Employee acknowledges that no representation, warranty, covenant or guaranty has been made or given to Employee as to the term of his or her employment.

4.      **Duties.**  As JV General Manager of the Bakery-Cafe, Employee shall supervise the operations of the Bakery-Cafe and shall report to the Joint Venture Partner or such other person as may be designated by Panera. Employee shall use Employee's best efforts, skill and knowledge to serve Panera in a competent manner, shall supervise the operations of the Bakery-Cafe in

1

accordance with the Panera system and the "Panera Bread," "Saint Louis Bread Company" or "Saint Louis Bread Co." concept.

Employee shall: (i) devote the entire business time, attention, and energies of Employee to the business of Panera and the operation of the Bakery-Cafe, (ii) faithfully and competently perform all duties hereunder, and (iii) comply with Panera's policies and procedures including, without limitation, its Standards of Business Conduct.

5.    **Compensation.**

5.1    Base Salary.  During the Term of Employment, Employee shall be paid a base salary of Fifty two thousand five hundred Dollars ($52,500.00) per annum.  Nothing in this Agreement is intended or should be construed to create a contract for a definite term (including the expression of Employee's base salary on an annualized basis).

5.2    Additional Compensation.    Employee also shall be eligible to receive additional compensation during the Term of Employment as set forth in the Compensation Plan.

5.3    Payment Schedule.  All payments hereunder, other than the payments made under the Compensation Plan, shall be made consistent with Panera's general payroll policy.  All payments hereunder are subject to the withholding requirements of governmental authorities and of the benefit plans for which Employee is eligible and has elected to participate, as applicable.

6.    **Vacation, Benefits, etc.**  Employee shall be entitled to vacation time and employee benefits, including insurance, in accordance with Panera's then current policies, which such policies may be changed by Panera from time to time in its sole discretion.

7.    **Termination.**  The Term of Employment shall terminate immediately upon the earlier to occur of the following:

(a)    The death of Employee; or,

(b)    Employee's Disability during the Term of Employment. For purposes of this Agreement, the term "Disability" shall mean the inability of Employee, arising out of any medically determinable physical or mental impairment, to perform the essential duties required of Employee hereunder on a consistent basis, with or without reasonable accommodations; or

(c)    At the election of Employee; or

(d)    At the election of Panera.

In the event of termination of this Agreement pursuant to this Section 7, Employee or Employee's estate, as appropriate, shall be entitled to receive (in addition to any fringe benefits payable upon death in the case of Employee's death) the compensation provided for herein up to and including the effective date of termination, prorated on a daily basis, but shall not be entitled to receive any severance payments.

8.    **Nondisclosure.**  Except in the performance of the duties hereunder, at no time during the Term of Employment or at any time thereafter, shall Employee, individually or jointly with

2

others, for the benefit of Employee or any third party, publish, disclose, use, or authorize anyone else to publish, disclose, or use, any secret or confidential material or information relating to any aspect of the business or operations of Panera or the Bakery-Cafe, including, without limitation, any secret or confidential information relating to the business, customers, trade or industrial practices, trade secrets, technology, recipes or know-how of Panera or the Bakery-Cafe.   The obligations of Employee under this Section 8 are in addition to, and not in limitation of, the obligations of Employee under Panera's Standards of Business Conduct (or successor document thereto).

9.    **Cooperation**.    Employee agrees that during the Term of Employment and thereafter, at Panera's reasonable expense, Employee shall do all things including, but not limited to, the giving of evidence in suits and other proceedings which Panera shall deem necessary or appropriate to obtain, maintain or assert rights accruing to, and defending claims against, Panera, its affiliates and/or franchisees in connection with which Employee has knowledge, information or expertise; provided, however, that Panera shall not unreasonably disrupt Employee's current employment and Panera shall compensate Employee for the value of Employee's time spent assisting in such matters at Employee's then current compensation rate if Employee is not so compensated by Employee's then current employer.

10.    **Attorneys' Fees**. In the event it is necessary for Panera or any of its affiliates to initiate legal proceedings to enforce, interpret or construe this Agreement, Employee agrees to pay all costs and expenses, including reasonable attorneys' fees, incurred by Panera or any of its affiliates.

11.    **Specific Performance**.    Employee agrees that a breach of any of the covenants contained in Section 8 will cause irreparable injury to Panera or its affiliates for which the remedy at law will be inadequate and would be difficult to ascertain and therefore, in the event of the breach or threatened breach of any such covenants, Panera or its affiliates shall be entitled, in addition to any other rights and remedies it may have at law or in equity, to obtain an injunction to restrain Employee from any threatened or actual activities in violation of any such covenants. Employee hereby consents and agrees that temporary and permanent injunctive relief may be granted in any proceedings which might be brought to enforce any such covenants without the necessity of proof of actual damages, and in the event Panera or its affiliates does apply for such an injunction, Employee shall not raise as a defense thereto that Panera or its affiliates has an adequate remedy at law.

12.    **Assignability**.    This Agreement and the rights and duties created hereunder shall not be assignable or delegable by Employee.   Panera shall have the right, without Employee's consent, to assign this Agreement and the rights and duties hereunder to any affiliate of Panera.

13.    **Notices**.   All notices or other communications provided for herein to be given or sent to a party by the other party shall be deemed validly given or sent if in writing and mailed, postage prepaid, by certified United States mail, return receipt requested, addressed to the parties at their addresses hereinabove set forth. Any party may give notice to the other party at any time, by the method specified above, of a change in the address at which, or the person to whom, notice is to be addressed.

14.    **Effect of Termination**.    The termination of this Agreement, for whatever reason, shall not extinguish those obligations of Employee specified in Sections 8 or 9 hereof.  Further, the

termination of this Agreement shall not affect any rights, claims or causes of actions which accrued to either party against the other prior to its termination, and a non-breaching party shall have full recourse against a breaching party for damages suffered as a result of any breach.

15.    **Waiver.**  The failure of a party to enforce any term, provision, or condition of this Agreement at any time or times shall not be deemed a waiver of that term, provision, or condition for the future, nor shall any specific waiver of a term, provision, or condition at one time be deemed a waiver of such term, provision, or condition for any future time or times.

16.    **Parties.**  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their legal representatives, and proper successors or assigns, as the case may be.

17.    **Governing Law.**  The validity, interpretation, and performance of this Agreement shall be governed by the laws of the State of Missouri without giving effect to the principles of comity or conflicts of laws thereof.

18.    **Jurisdiction.**  Each party hereto agrees to submit to the exclusive personal jurisdiction and venue of the state and federal courts in the State of Missouri, in the judicial circuit where Panera has its principal office, for resolution of all disputes and causes of action arising out of this Agreement, and each party hereby waives all questions of personal jurisdiction and venue of such courts, including, without limitation, the claim or defense therein that such courts constitute an inconvenient forum.

19.    **Limitations on Legal Actions.**  Except with respect to the obligations specified in Section 8, each party waives, to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other party and the right to recover consequential damages for any claim directly or indirectly arising from or relating to this Agreement.  Furthermore, the parties agree that any legal action in connection with this Agreement shall be tried to the court sitting without a jury, and all parties hereto waive any right to have any action tried by jury.

20.    **Pronouns.**  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require.

21.    **Captions; Terms.**  The captions of this Agreement are for convenience only, and shall not be construed to limit, define, or modify the substantive terms hereof.

22.    **Counterparts**.  This Agreement may be executed in several identical counterparts that together shall constitute but one and the same Agreement.

(SIGNATURES ON FOLLOWING PAGE)

I:\Private\JV Program\new JVGM Employment Agreement final per Michele merge document.doc

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

EMPLOYEE:

_____
Pati Johns


PANERA:

PANERA, LLC,
a Delaware limited liability company


By:_____
John Maguire
Executive Vice President

              Its: